# United States Court of Appeals
# for the Federal Circuit

2012-1300
(Serial No. 10/984,186)

IN RE JAMES W. BIONDI and AARON FAND
(Real Party in Interest Cardiopulmonary Corp.)

APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE,
BOARD OF PATENT APPEALS AND INTERFERENCES.

_____

## OPENING BRIEF OF APPELLANTS
_____

John J. Cotter
Thomas A. Turano
**K&L Gates LLP**
One Lincoln Street
Boston, MA 02111
617.261.3100

*Attorneys for Appellants*

July 3, 2012

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

In re James W. Biondi and Aaron Fand $_{\text{V.}}$ _____

No. 2012-1300

AMENDED

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

John J. Cotter _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.     The full name of every party or amicus represented by me is:

James W. Biondi and Aaron Fand

_____

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

Cardiopulmonary Corp.

_____

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None.

_____

4.  ☑  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Testa Hurwitz & Thibeault LLP, K&L Gates LLP, Thomas A. Turano, John J. Cotter, James E. Fajkowski, James A. Culverwell, Kenneth X. Xie, Ronda P. Moore, Michael H. Brodowski, John V. Forcier, Steven J. Frank, Duncan A. Greenhalgh, Ira V. Heffan, Christopher W. Stamos, Robert J. Tosti, Christine C. Vito

_____

July 3, 2012 _____

Date

_____

Signature of counsel

John J. Cotter

Printed name of counsel

Please Note: All questions must be answered

cc: Nathan K. Kelley, Raymond T. Chen _____

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................... iii

STATEMENT OF RELATED CASES .................................................. v

JURISDICTIONAL STATEMENT ....................................................... 1

STATEMENT OF ISSUES ................................................................... 2

INTRODUCTION AND STATEMENT OF THE CASE ......................... 4

STATEMENT OF FACTS ................................................................... 6

I.    The '186 Application's Claims Require A System In Which
      Medical Devices Are Monitored Remotely Over A Network ........................ 6

II.   The Cited References Do Not Teach
      Appellants' Medical Device Monitoring System ........................................... 9

      A.    Van Oostrom Discloses a Data Acquisition and
            Control Unit that Communicates with Medical Devices
            that Use Different Protocols and that Cannot Directly
            Communicate Over a Network ............................................................. 9

      B.    The Secondary Kerr, Ortiz, and Zimowski References Separately
            or Combined With Van Oostrom Do Not
            Disclose Appellants' System .............................................................. 14

III.  The Board Rejected All Claims As Obvious, By Accepting the
      Examiner's Rearrangement of Van Oostrom And Combining
      It With Both Kerr And Ortiz ...................................................................... 18

SUMMARY OF ARGUMENT ............................................................. 24

ARGUMENT ..................................................................................... 26

I.    Legal Standards ........................................................................................ 26

II.     The Board Failed to Make *Prima Facie* Case of Obviousness
        Because There Is No Motivation to Modify the
        Primary Reference, van Oostrom ................................................................27

        A.     The Board's obviousness rejection relies on modifications
               to van Oostrom's system that render van Oostrom inoperable for
               its intended purpose by detaching medical devices from
               the data acquisition unit......................................................................28

        B.     In addition to rendering van Oostrom's system inoperable,
               the Board's proposed modification renders the data
               acquisition unit superfluous by inserting two network access
               points between van Oostrom's data acquisition unit and its
               attached medical devices .....................................................................32

III.    The Board Engaged in Hindsight Analysis by Retrofitting
        the Prior Art ..................................................................................................33

IV.     The Board Adopted Unreasonably Broad Claim Constructions
        that Directly Affected the Board's Obviousness Determination...................35

        A.     The Board erred by defining "server" so broadly as
               to include van Oostrom's data unit .....................................................35

        B.     The Board erred by ignoring that a "network
               access point" has a protocol conversion requirement .........................36

CONCLUSION .........................................................................................................39

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF
APPELLATE PROCEDURE 32(a)(7)(B) AND
FEDERAL CIRCUIT RULE 32(b)

# TABLE OF AUTHORITIES

Page

## FEDERAL CASES

In re American Acad. of Sci. Tech. Ctr.,
    367 F.3d 1359 (Fed. Cir. 2004) ...................................................................27

In re Chapman,
    595 F.3d 1330 (Fed. Cir. 2010) ............................................................ 26, 35

In re Gartside,
    203 F.3d 1305 (Fed. Cir. 2000) ...................................................................26

In re Glaug,
    283 F.3d 1335 (Fed. Cir. 2002) ...................................................................27

In re Gordon,
    733 F.2d 900 (Fed. Cir. 1984) .....................................................................27

In re ICON Health & Fitness, Inc.,
    496 F.3d 1374 (Fed. Cir. 2007) ...................................................................27

In re Khan,
    441 F.3d 977 (Fed. Cir. 2006) .....................................................................26

KSR Int'l Co. v. Teleflex, Inc.,
    550 U.S. 398 (2007)......................................................................................26

Rowe v. Dror,
    112 F.3d 473 (Fed. Cir. 1997) .....................................................................27

In re Suitco Surface, Inc.,
    603 F.3d 1255 (Fed. Cir. 2010) ...................................................................27

In re Watts,
    354 F.3d 1362 (Fed. Cir. 2004) ...................................................................26

WMS Gaming, Inc. v. Int'l Game Tech.,
    184 F.3d 1339 (Fed. Cir. 1999) ...................................................................26

## STATUTES

28 U.S.C. § 1295(a)(4)(A) ........................................................................1

35 U.S.C. §103(a) ...................................................................................2

35 U.S.C. § 134 ......................................................................................1

35 U.S.C. § 141 ......................................................................................1

35 U.S.C. § 142 ......................................................................................1

## STATEMENT OF RELATED CASES

No other appeal in or from the same proceeding was previously before this or any other appellate court under the same or similar title, and there is no related case pending in this or any other court.

# JURISDICTIONAL STATEMENT

Cardiopulmonary Corp. is the owner of U.S. Patent Application No. 10/984,186 (the "'186 application"), the subject of this appeal.

The Board of Patent Appeals and Interferences ("Board") issued a Decision on Appeal on December 30, 2011, in which the majority affirmed the Examiner's rejection of all pending claims.  The statutory basis for jurisdiction of the Board for hearing the appeal of the Examiner's rejection is 35 U.S.C. § 134.

Appellants did not request rehearing.  The Board's Decision on Appeal constitutes a final decision of the Board.

Appellants timely filed the Notice of Appeal to this Court on February 21, 2012, within the time provided under 35 U.S.C. § 142.  This Court has exclusive jurisdiction of appeals from the Board under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. § 141.

## STATEMENT OF ISSUES

1.     Does the Board majority's rejection of the pending claims under 35 U.S.C. §103(a) as obvious over the primary reference, van Oostrom, lack the Federal Circuit's required "rational underpinning to support the legal conclusion of obviousness," when the rejection both:

> (a) manipulates van Oostrom to render superfluous and unsatisfactory for its intended purpose the only disclosed structure of that reference, namely the data acquisition and control unit to which multiple medical devices are connected *before* remotely connecting to a central office; and
>
> (b) vitiates van Oostrom's primary mode of operation, which is solving "the communication protocol problem" posed by connecting multiple medical devices that use multiple communication protocols *before* remotely connecting to a central office?

2.     Did the Board majority engage in improper piecemeal hindsight analysis by picking some and ignoring other teachings and requirements of van Oostrom and the secondary references, and rearranging the selected portions to try and meet Appellants' claim limitations?

3.    Did the Board err under the "broadest reasonable interpretation" standard by ignoring the teachings of the Appellants' specification and of the cited prior art when the Board construed:

(a) "network access point" without the limitation to converting serial data from the medical device into a network protocol as specified in Appellants' specification; and

(b) "server" as simply a computer with temporary storage, even though the "server" of Appellants' claims includes dedicated medical device application programs for multiple types of medical devices, and a listener/pollster that selectively polls the individual medical devices for data and does not simply allow each medical device to place data on the network.

## INTRODUCTION AND STATEMENT OF THE CASE

On November 8, 2004, Cardiopulmonary Corp. filed the '186 application, entitled "Network Monitoring Systems for Medical Devices." The '186 application is a continuation of parent application no. 09/791,334, filed on February 23, 2001, which is now U.S. Patent No. 6,839,753 (the '753 patent). The '186 application is terminally disclaimed over the parent '753 patent.

Claims 17-40 of the '186 application stand rejected by the Board as allegedly obvious. All claims are included in this appeal.

After Appellants overcame anticipation and obviousness rejections based on prior art that is not at issue on appeal, the Examiner rejected the claims as obvious, primarily over U.S. Patent No. 6,074,345 to van Oostrom *et al.* ("van Oostrom"). The Examiner based those rejections, and his conclusion that van Oostrom meets Appellants' claims, on a modification of van Oostrom which rearranged van Oostrom's disclosed structure. After Appellants responded, the Examiner issued a final Office action rejecting claims 17-25 and 28-40 as obvious over van Oostrom in view of U.S. Patent No. 6,942,616 to Kerr II ("Kerr") and further in view of U.S. Publication 2008/0065768 to Ortiz *et al.* ("Ortiz"). Also, the Examiner rejected claims 26 and 27 as obvious over van Oostrom in view of Kerr and Ortiz, and further in view of U.S. Patent No. 6,339,771 to Zimowski *et al.* ("Zimowski").

Appellants filed a timely pre-appeal request for review, and the pre-appeal panel decided that the application should proceed to the Board.  After Appellants completed briefing, the Board held a hearing, and in a 2 to 1 decision the Board affirmed the Examiner's rejection.  Judge Gonsalves dissented, terming the Board's modification of van Oostrom "irrational," as rendering van Oostrom's key element, a data acquisition and control unit, "superfluous," and thus lacking the rational underpinning required under *KSR*.

Appellants then filed this Appeal.

## STATEMENT OF FACTS

**I.    The '186 Application's Claims Require A System In Which
Medical Devices Are Monitored Remotely Over A Network.**

The '186 application claims network monitoring systems for collecting data

from a plurality of heterogeneous medical devices over a network.  (A33; A51;

A91; A286-289.)  The centralized system of the claimed invention enables

hospitals to monitor all the patients from a single location, with minimal human

involvement, and to notify the central location if there is an alarm.  (A32-33.)

The medical devices are at one location on one side of the network and the

server is at another location on the other side of the network.  (A33; A35; A91.)  At

the time of invention, medical devices (*e.g.*, ventilators) in general were not

network ready and therefore required a local monitoring system for each type of

device—*i.e.*, the devices could not transmit data directly over a network.  (A32.)

Thus, among other things, inventors Biondi and Fand recognized the advantage of

monitoring different medical devices over a network from a central station by

providing network access points on both the medical device side of the network

and on the server side of the network, and by combining that hardware with the

appropriate software to convert data into a format suitable for transmission over

the network (*e.g.*, TCP/IP protocol) and to poll, monitor, and control those

different devices over the network.  (A35-36; A286-289.)

The server runs a dedicated application program for each type of medical device connected to the network in order to communicate with the medical devices. (A33; A36; A286-289.) The server also includes a listener/pollster that actively "polls," or prompts, medical devices for data and "listens" for data coming from medical devices. (A33; A36.) The listener/pollster passes data requests from the dedicated application programs to the medical devices and then listens for their responses over the network. (A36.)

A database in communication with the server stores data from the medical devices. (A33; A35; A286-289.) The data can include medical device settings, measured patient values, alarm conditions, and other data. (*Id.*) A user, such as a caregiver, can access the data using a browser on a client computer located anywhere on the network. (*Id.*)

More specifically, as shown in Figure 1 of the '186 application, reproduced below, medical device 20 communicates over a network 30 with a server 36 running an application program 50 specific to medical device 20. (A35-36; A91.) On the medical device side of the network, a first network access point 26 interfaces the medical device with the network. (*Id.*) The first network access point converts data produced by the medical device (*e.g.*, RS232 serial data) into a suitable network protocol (*e.g.*, TCP/IP, Ethernet, wireless Ethernet, radio frequency) for transmission over the network to server 36. (A35-36.) The first

network access point also converts data coming from the server back into a format that is recognizable by the medical device (*e.g.* RS232 serial data).  (*Id.*)



FIG. 1 of the '186 Application

On the server side of the network, a second network access point 26' connects the server to the network 30.  (A35-36; A91.)  In a preferred embodiment, the server communicates with second access point 26' through router 40.  (A35; A287.)

## II. The Cited References Do Not Teach Appellants' Medical Device Monitoring System.

### A. Van Oostrom Discloses a Data Acquisition and Control Unit that Communicates with Medical Devices that Use Different Protocols and that Cannot Directly Communicate Over a Network.

The Board majority relied primarily on van Oostrom in rejecting the claims as obvious (A4), even though van Oostrom discloses only a system based on a local data acquisition and control unit ("data acquisition unit") for collecting data from medical devices using various protocols, and configuring that data for transmission to a central location. (*See* A623-624.) van Oostrom fails to disclose numerous features of Appellants' claims, including: a first network access point, a second network access point, a server in communication with the second network access point, a listener/pollster in the server transmitting data through the second network access point, dedicated medical device application programs and a database in connection with the server. (*See* A286-289.)

Fundamentally, van Oostrom identifies and discloses a solution for a problem in "coordinating data and transmissions" for multiple medical monitoring devices and therapeutic devices, which differ in "1) their hardware communication protocol, 2) their software communication protocol, and 3) their data (input and/or output)." (A621 at 1:48-56.) Van Oostrom identifies the lack of standard communication processes and protocols and configuration data for medical devices as being a problem (A621 at 2:1-8), and then discloses a solution to that problem

by providing "a unique method apparatus for connecting to and coordinating data communications of various devices of differing protocols and parameter settings." (A621 at 2:45-48.)  That unique apparatus is a data acquisition unit that attaches directly to medical devices and parses various medical device protocols into a standard format prior to transmission over a network to a central station.  (A622 at 4:58-65; A623 at 5:25-42; A624 at 7:66-8:19.)

Van Oostrom notes that direct connections between a single device and a central station were known in the art (A621), and that medical devices can include a variety of communication protocols, including network interfaces.  (A623 at 5:29-34.)  However, as van Oostrom also noted, it is difficult to coordinate data across a network from a plurality of different medical devices because of differences in hardware communication protocols, software communication protocols, data format, and communication initiation protocols.  (A621 at 2:1-8.)

Van Oostrom "solved the network communication problem" by connecting all medical devices to the data acquisition unit 10 before transmitting data from those medical devices over a network.  (A623 at 5:25-66.)  The data acquisition unit provides "a way to separate out only that part of the communication that is different between the various monitors and therapeutic devices, and to use common methods for the rest."  (A623 at 5:25-29.)  Thus, the data acquisition unit collects the data from diverse protocols and standardizes the data for transmission.

(*Id*.)  After passing through the data acquisition unit, medical device data is then transmitted across a communication link such as a network to a central station, which may be remotely located relative to the data acquisition unit.  (A624 at 7:66-8:19.)  Although the Board majority relied heavily on van Oostrom's mention in passing that device hardware protocols may include a network interface (A12; *see* A623 at 5:32), there would be no need for van Oostrom's data acquisition unit if medical devices could connect directly to a network.  Instead, van Oostrom's data acquisition unit is designed for those devices that do not have a network interface.

Van Oostrom's system architecture is shown in Figure 1, reproduced below. (A606.)



Van Oostrom's FIG. 1

The *only* circuitry van Oostrom discloses is in Figure 2 reproduced below, which provides "a schematic diagram of the circuitry of the data acquisition unit of the present invention." (A607; A622 at 4:11-12.)



Van Oostrom's FIG. 2

In all of van Oostrom's embodiments, each medical device connects to the data

acquisition unit by an RS232 serial connection by way of a serial cable, which is a

hardwire connection.  (*See*, *e.g.*, A607; A621 at 2:9-15; A621-A622 at 2:63-3:3;

A622-A623 at 4:66-5:15; A623 at 5:25-42; A623 at Table 1; A623 at 6:33-57; A624 at 7:7-35; A626 at 11:32-39; A626 at 11:66-12:6; A626 at 12:29-46; A626-627 at 12:66-13:15; A627 at claim 17; A628 at claims 24 and 32.)  As shown in Figure 2, the circuitry disclosed is only capable of receiving data via RS232 connections.

**B.      The Secondary Kerr, Ortiz, and Zimowski References Separately or Combined With Van Oostrom Do Not Disclose Appellants' System.**

Admitting that van Oostrom failed to anticipate various features of Appellants' claims, the Examiner and the Board modified van Oostrom and combined it with Kerr, Ortiz, and Zimowski to allegedly provide the features missing from van Oostrom.  (A8-10.)

Similar to van Oostrom, Kerr discloses an integration system that acquires and formats data from a plurality of medical devices.  (A636 at 2:37-53.)  The integration system, in turn, connects to a communication system that serves as a network interface.  (*Id.*)  The Board cited Kerr's integration and communication systems as required to meet the first network access point limitation of Appellants' claims.  (A9.)  Kerr's system architecture is shown in Figure 1, reproduced below. (A633; *see also*, A635.)



Kerr's FIG. 1

Regarding network access points, Kerr discloses that data undergoes

protocol conversion at a network access point:

> The communication system *formats the data* received from the
> integration system *for transmission over a network* to the remote
> system. In a preferred embodiment, the data are sent over the Internet
> to the remote system. *The data can be formatted in any of a variety of*
> *appropriate formats known in the art.* If sent over the Internet, the
> *data may be put into any of the established Internet communications*
> *protocols.* For example, a text string containing the data could be
> inserted into the subject line or body of an Internet email, which
> would then be sent to a desired email address. Alternatively, the data

could be put into a markup language such as HTML or XML, be inserted into a file sent over the network, or sent via a secure protocol such as SHTTP or SSL.

(A637 at 4:30-44 (emphasis added).)

Ortiz teaches streaming media, such as video, to a handheld device. (A642 at Abstract.) Ortiz was cited by the Board as teaching that network access points are notoriously old and well known. (A9-10.) Specifically, the Board relied on Ortiz as meeting the second network access point limitation recited in Appellants' claims. (*Id.*) Ortiz's Figure 8 is reproduced below. (A649.)

Ortiz teaches various wireless network access points, all of which require specific *protocols* for transmission over a network. (A670 at ¶¶ 109-110.)



Ortiz's FIG. 8

Finally, the Zimowski reference was relied upon to reject dependent claims 26 and 27. Zimowski's teachings are irrelevant for purposes of this appeal because these dependent claims are not argued separately.

## III. The Board Rejected All Claims As Obvious, By Accepting the Examiner's Rearrangement of Van Oostrom And Combining It With Both Kerr And Ortiz.

By a 2 to 1 decision issued over a detailed dissent, the Board majority affirmed the Examiner's rejection of all pending claims—*i.e.*, claims 17-40—relying on van Oostrom as the primary reference. (A17-18.)

The obviousness rejection can be summarized as follows:

- Begin with van Oostrom's system, shown in van Oostrom's Figure 1 above. (A8.)

- Disconnect van Oostrom's data acquisition unit 10 from medical devices 60a-z, and move the data acquisition unit over the network.[1] (A9.)

- Attribute to van Oostrom's data acquisition unit the functionality of Appellant's claimed server, running both dedicated medical device application programs and a listener/pollster over a network, despite the fact that the computer 20 and storage elements 22 and 24 within van Oostrom's data acquisition unit perform data control, acceptance, and conversion rather than data polling and data storage over a network as performed by the server in Appellants' invention. (A14-16.)

---

[1] The majority ignores that van Oostrom's data acquisition unit's essential function is to receive data from medical devices and to package it suitably for transport over the network, which necessarily occurs *before* the data is sent over the network. (*See* A621-622.)

- Add a first network access point, taught by Kerr, between the medical devices and the network, so that the medical devices connect directly to the first network access point rather than to data acquisition unit 10. (A9.)

- Add a second network access point, from Ortiz, between the network and the data acquisition unit, so that the data acquisition unit communicates directly with the second network access point rather than with medical devices. (A9-10.)

More specifically, the Board majority held that van Oostrom's data acquisition unit is equivalent to Appellants' claimed server because the data acquisition unit possesses a data management system, a data buffer, that temporarily stores and transmits data to other systems over a network. (A14.) The Board majority then found that it would have been obvious to replace van Oostrom's serial connections between the medical devices and the data acquisition unit with a first network access point as allegedly taught by Kerr. (A9.) Similarly, the Board majority found that it would have been obvious to add a second network access point as taught by Ortiz, reasoning that network access points are notoriously old and well known for connecting servers to networks. (A9-10.) The

Board majority characterized the modifications as substitution of one known element for another, rather than as hindsight analysis.  (A13.)

The Board majority was unpersuaded that these modifications to van Oostrom's system change van Oostrom's principal mode of operation and render it unsatisfactory for its intended purpose.  (A10-11.)  The Board majority disagreed that replacing van Oostrom's serial lines with a network access point was a material change.  (A10-12.)  Although Appellants' specification teaches that a network access point converts data to/from a network protocol (A35-36; A355), the Board found Appellants' specification did not include such an explicit definition.  (A11.)  Instead, the Board held that a network access point does not require any data protocol conversion, but merely requires a point at which a network can be accessed.  (*Id*.)  Under this construction, the Board found that modifying van Oostrom to include first and second network access points did not require protocol conversion.  (*Id*.)  This is of course contrary to how van Oostrom characterizes what his own device does; namely, converting the protocols from the medical devices into a standard protocol.

In addition, the Board argued that van Oostrom's teachings are not limited to serial connections between medical devices and the data acquisition unit.  (A12.)  Instead, according to the Board, van Oostrom "suggests" that medical devices can communicate with the data acquisition unit using a variety of communication

protocols, including network interface hardware.  (*Id*.)  Consequently, the Board

found that inserting two network access points between van Oostrom's medical

devices and the data acquisition unit "would not require any conversion of serial

data from the medical device into a network protocol."  (*Id*.)

The Board also rejected Appellants' ordinary definition of "server" as "a

computer in a network that is used to provide services (such as access to files or

shared peripherals or the routing of e-mail) to other computers in the network."

(A14, A433.)  Instead, the Board majority found that van Oostrom's data

acquisition unit is equivalent to Appellants' server, even though van Oostrom's

data acquisition unit only passes information to and from a central station from and

to medical devices using the data acquisition unit's protocol.  (A14.)

In his dissent, Judge Gonsalves found the obviousness rejection "irrational,"

(A21), because "one of ordinary skill in the art would not have modified the

system of the primary reference, van Oostrom, in the manner described by the

Examiner and the majority."  (A19.)  More specifically, Judge Gonsalves noted

that:

> van Oostrom's Data Acquisition & Control Unit 10, "is designed to
> recognize, understand, and communicate with each of these [medical]
> devices and their unique hardware communication protocol, software
> communication protocol, and data requirements (input and/or
> output)."

*(Id.* (quoting van Oostrom at 4:61-65).)  Judge Gonsalves reasoned that "moving the van Oostrom data acquisition unit to the opposite side of the network as the medical devices by replacing the direct connections between the medical devices and the control unit with connections to a network, as proposed by the Examiner, vitiates van Oostrom's purpose," (A19-20), and "would render van Oostrom's control unit superfluous."  (A20.)

Judge Gonsalves also pointed out that:

> There would be no need for the control unit to collect data and transmit it through a network if the data had already been sent through the network before it reached the control unit.  Moreover, if the control unit were moved to the opposite side of the network as the medical devices, additional means would be needed to get data from the serial lines of the medical devices to the network.

(A20.)  In other words, according to van Oostrom, the data acquisition unit is required to place medical device information on a network because the medical devices themselves were unable to communicate using the network protocol.  Thus, in keeping with van Oostrom's teachings, moving the data acquisition unit would necessitate another network conversion device for the medical devices to attach to in order for the protocol of the medical device to be changed to the protocol of the network.

Finally, Judge Gonsalves cited the hearing transcript, during which he concluded:

JUDGE GONSALVES:  And that if you take the network, what's taught about network access points in Kerr and you move it between the devices and controller, then –

MR. TURANO:  You're back at the same place again.

JUDGE GONSALVES:  Yeah.  Then, basically, you don't really need the controller for anything.

(A21.)

# SUMMARY OF ARGUMENT

Appellants' claimed invention was a significant advancement in the medical surveillance field at the time of filing in early 2001.

In affirming the Examiner's rejection of the claims as obvious, the Board majority made several leaps—without any logical rationale—to support its affirmance. This is improper.

In particular, the Examiner and the Board admitted that

> van Oostrom does not describe a first network access point in communication with the plurality of medical devices, a network in communication with said first network access point, and a second network access point in communication with the network, and the data acquisition and control device [sic; server] in communication with the second network access point.

(A8.) Next, the Board modified van Oostrom with Kerr to "replace van Oostrom's wire connections between the data acquisition unit and medical devices with transmission of medical and health related data to a server over a network as taught by Kerr." (A9.) Although the Examiner and Board also admitted that "Kerr does not explicitly show a second network access point in communication with the network and where the server (*i.e.*, Kerr's remote system) [is] in communication with the second network access point," the Board majority simply concluded such a second network access point was "notoriously old and well known," citing Ortiz. (A9-10.) Finally, the Examiner and Board decided it would have been obvious "to

modify the system of van Oostrom's as modified by Kerr to include a second network access point in communication with the network, and where the data acquisition and control unit (*i.e.*, server) is in communication with the second network access point in order to enable the data acquisition and control unit (*i.e.*, server) to access a network." (A10.)

However, the modifications proposed by the Board renders van Oostrom's system inoperable because the data acquisition unit's essential function is to receive data directly from medical devices and to package the data suitably for transport over the network, which necessarily occurs *before* the data is sent over a network. Consequently, moving the data acquisition unit across the network to call it a "server" would destroy van Oostrom's system and vitiates the purpose of van Oostrom's data acquisition unit.

This cobbling together of multiple references and modification upon modification of the references is exactly the kind of piecemeal hindsight analysis to map the prior art on Appellants' claims that constitutes error of law.

In addition, the Board's decision is built on a foundation of unreasonable claim construction of "network access point" and "server," which construction also constitutes reversible legal errors.

# ARGUMENT

## I.    Legal Standards.

The Court reviews the Board's legal conclusions *de novo* and reviews the Board's findings of fact for substantial evidence.  *In re Chapman*, 595 F.3d 1330, 1337 (Fed. Cir. 2010).  To prevail on appeal, an appellant must show the existence of a harmful error that affected the decision below.  *Id.* at 1338 (citing *In re Watts*, 354 F.3d 1362, 1369 (Fed. Cir. 2004)(internal citations omitted).

Obviousness is a question of law that is reviewed *de novo*, based on underlying findings of fact that are reviewed for substantial evidence.  *In re Gartside*, 203 F.3d 1305, 1316 (Fed. Cir. 2000).  The underlying findings of fact include: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) objective evidence of non-obviousness.  *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1355 (Fed. Cir. 1999).

To make a *prima facie* case of obviousness based on a combination of known elements, the Board must articulate a rational basis for why a person of skill in the art would modify the prior art to arrive at the claimed invention.  *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) (citing *In re Khan*, 441 F.3d 977, 988 (Fed. Cir. 2006)).  There is no motivation to modify the prior art if a

proposed modification would render the prior art inoperable for its intended purpose. *In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984). Moreover, inoperability teaches away from combination. *Id*. If the Board fails to establish a *prima facie* case of unpatentability, "then the applicant is entitled to the patent." *In re Glaug,* 283 F.3d 1335, 1338 (Fed. Cir. 2002).

During examination, the claims are given their broadest reasonable interpretation consistent with the specification. *In re Suitco Surface, Inc*., 603 F.3d 1255, 1259 (Fed. Cir. 2010) (quoting *In re ICON Health & Fitness, Inc.,* 496 F.3d 1374, 1379 (Fed. Cir. 2007) and citing *In re American Acad. of Sci. Tech. Ctr.,* 367 F.3d 1359, 1364 (Fed. Cir. 2004)). However, the broadest construction requirement "does not give the PTO an unfettered license to interpret claims to embrace anything remotely related to the claimed invention," *In re Suitco Surface*, 603 F.3d at 1260, or relieve the Board of its essential task of examining the entire patent disclosure to discern the meaning of claim words and phrases. *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997). Instead, the claims must be read in light of the specification, and the claim interpretation must be reasonable. *In re Suitco Surface*, 603 F.3d at 1260.

## II. The Board Failed to Make *Prima Facie* Case of Obviousness Because There Is No Motivation to Modify the Primary Reference, van Oostrom.

The majority did not meet its burden of making a *prima facie* obviousness case because there is no suggestion or motivation to modify van Oostrom to arrive

at Appellants' claimed invention.  Specifically, a person of skill in the art would not modify van Oostrom's system by moving the data acquisition unit from the transmission end (*i.e.* medical device end) of a network to the receiving end (*i.e.* remote monitoring end) of the network.  To do so would render van Oostrom's system inoperable because (1) data protocol conversion is required for van Oostrom's medical devices to connect to a network; and (2) van Oostrom's device would then be rendered superfluous because, if the medical devices could connect to a network, there would be no reason to have any of the hardware required by van Oostrom's disclosure.

At best, the proposed modifications vitiate the purpose of van Oostrom's data acquisition unit, and can be cobbled together only after making significant changes to van Oostrom's system that completely alter its architecture.  Consequently, the Decision is not supported by substantial evidence.  Instead, the Board majority's decision relies on piecemeal assembly of the prior art using hindsight to create Appellants' claimed invention.

### A.    The Board's obviousness rejection relies on modifications to van Oostrom's system that render van Oostrom inoperable for its intended purpose by detaching medical devices from the data acquisition unit.

The central feature of van Oostrom's system is a data acquisition unit that accepts data from a plurality of different medical devices and formats the data into a more efficient package prior to transmission to a central station or other location.

Van Oostrom phrases the problem solved by his invention (*i.e.*, the data acquisition

unit) as a lack of networking standards in the medical device industry:

> To date, unfortunately, no standards have been developed that govern
> the communication process and protocols for medical devices. As a
> result, the data that is communicated is non-standardized, differs from
> manufacturer to manufacturer and even sometimes differs with
> various software versions of the same device. In addition,
> configuration data needed to start the communication process is also
> non-standardized.

(A621 at 2:1-8.)

Van Oostrom "solved the communication problem" with his data acquisition

unit, which serves as a network interface that enables different medical devices

with different communication protocols to communicate their data over a network.

Van Oostrom's medical devices could not operate over a network without the data

acquisition unit at the interface between the medical devices and the network.  If

the data acquisition unit were removed, or moved to other side of the network as

proposed by the majority, then the medical devices could not connect to the

network.

In all of van Oostrom's embodiments, medical devices are attached to the

data acquisition unit by hardwired connections (*i.e.*, RS232 serial cables), similar

to how a keyboard and mouse are connected to a computer, which further

exemplifies that the data acquisition unit is locally connected to the medical

devices.  Even if the medical devices were wirelessly connected to the data

acquisition unit, the data acquisition unit would still be required as an interface

between the medical devices and the network.  The topography of van Oostrom's

system is clear from the one passage in van Oostrom that discusses remote

monitoring:

> ***The unit 10 may be directly or remotely connected to a central office
> 70*** or care center for reporting and storing data and controlling ***the
> attached devices***. In a preferred embodiment, the data acquisition and
> control unit 10 of the present invention preferably utilizes a single
> board computer capable of running the MS-DOS operating system. It
> is envisioned that the remote unit may be used in a variety of
> situations where remote monitoring may become necessary, such as
> on vessels out at sea, rural villages and towns, and the like. ***The data
> may be transmitted (via modem, satellite, radio wave, wiring, infra-
> red, or other communication means) to a "central station" or other
> location as desired***, such as a doctor's office, nurse's station, third-
> party monitoring station, alternative sites, base stations, port/naval
> stations (from a ship), and the like. The term "remote" as used herein
> does not necessarily mean "far removed." ***The unit 10 may be directly
> attached (hard-wired) to its "central office" in the same room or
> building.*** Furthermore, the functions of the "central office" (such as
> visual displays, data recording, control, etc.) may be incorporated into
> a single system in conjunction with the unit 10 if desired.

(A624 at 7:66-8:29 (emphasis added).)

Thus, the data acquisition unit together with the attached medical devices

can be located remotely (*e.g.*, on a boat) relative to a central office or other

location.  Moreover, from the above passage, van Oostrom clearly knew about

networks.  If van Oostrom's data acquisition unit were to be used for gathering

medical device data remotely over a network, van Oostrom would have indicated

as much by not limiting his disclosure to serial line connections to devices. But as van Oostrom indicates, the majority if not all medical devices of the time connected over serial lines rather than with direct network connections. (A621.) Moreover, at a fundamental level, the purpose of van Oostrom's device is to collect and format data for transmission, which means that, absent his data acquisition unit, medical devices could not communicate over a network.

The Board's proposed modification—moving the data acquisition unit to the other side of a network—is contradictory to van Oostrom's teachings and would render van Oostrom's system inoperable, as Appellants have maintained throughout prosecution. A person of skill in the art would not be motivated to modify van Oostrom as proposed by the majority. Judge Gonsalves agreed with Appellants in his dissent opinion, asserting that the "modification of van Oostrom's system proposed by the Examiner and adopted by the majority is irrational." (A21.)

In addition, Appellants' claims recite a server having a listener/pollster which passes data back and forth through a second access point, through the network, and through the first access point to the medical devices. That is, the instant invention passes data to and from a server, as well as from and to medical devices through a network. Thus, in Appellants' claimed invention, the server, listener/pollster, database, and second network access point are on one side of the

- 31 -

network, and the medical devices and the first network access point are on the other side of the network.

Appellants' "server" and "network access points are not interchangeable with van Oostrom's data acquisition and control unit. Although the Board would replace the data acquisition unit with another network access point, a data acquisition unit has other functionalities that are required on the device side of the network, such as data collection, control and protocol standardization.

**B.**     **In addition to rendering van Oostrom's system inoperable, the Board's proposed modification renders the data acquisition unit superfluous by inserting two network access points between van Oostrom's data acquisition unit and its attached medical devices.**

In modifying van Oostrom to meet Appellants' claims, the majority in fact renders van Oostrom's data acquisition unit superfluous by replacing it with a first network access point, as taught by Kerr. (A20.) As noted above, the data acquisition unit operates as a network access point that puts medical devices on a network. Consequently, replacing the data acquisition unit with another network access point vitiates a primary purpose of the data acquisition unit. Furthermore, the majority modified the data acquisition unit so that it could be called a "server," to meet another limitation of Appellants' claims. While Appellants disagree with the majority's construction of the term "server," for present purposes what is important is that the Board ignored the primary purpose of the data acquisition unit by repurposing it as a server on the distant end of a network, disregarding that van

Oostrom really teaches data concentration and protocol conversion from attached medical devices.

Moreover, as stated previously, there would be no need for van Oostrom's data acquisition unit if different medical devices with their different communications systems could connect to a network.

For van Oostrom, the data acquisition unit is not a standard component known in the art; rather, that unit is the heart of his disclosure. That unit's precise location in his system is what made communication with multiple medical devices possible. Thus, a person of skill in the art would not detach medical devices from the data acquisition unit. Nor would a person of skill in the art move the data acquisition unit across a network.

## III.   The Board Engaged in Hindsight Analysis by Retrofitting the Prior Art.

Van Oostrom was well designed for its specific purpose and one of skill in the art would not have considered completely destroying van Oostrom's functionality as proposed by the Board majority. The only motivation to reconfigure van Oostrom's teachings comes from Appellants' own claims.

The Examiner and the Board engaged in piecemeal analysis of the claims and selectively modified the prior art to meet Appellants' claims. Adding two network access points (taught by different references) and moving a medical device adapter unit across a network is far from a mere substitution. It is a

complete repurposing of the van Oostrom data acquisition unit. Consequently, the Board's analysis is not a mere substitution of one element for another (*see* A13), but instead is a significant *post hoc* restructuring of the prior art.

For example, the Board Examiner moved van Oostrom's data acquisition unit across the network to arguably meet Appellants' "server" limitation. That in turn necessitated finding two network access points, which the Board admitted does not exist in van Oostrom. So the Board pieced together the modified van Oostrom data acquisition unit with Kerr's network access point. Still lacking a second network access point, the Board then turned to Ortiz for its teaching of network access points, all while ignoring the purpose of van Oostrom's data acquisition unit as a device interface.

Ironically, Kerr requires an integration system similar to van Oostrom's data acquisition unit as an intermediary between the medical devices and the network access point. (*See*, *e.g.*, A548, A633, A635.) Thus, the motivation to combine does not come from Kerr and it certainly does not come from van Oostrom, which teaches away from inserting a network access point between the medical devices and the data acquisition unit.

Van Oostrom chose to coordinate multiple devices by providing a local hardware solution that permitted multiple different devices to communicate with a network. The Board majority chose to ignore completely van Oostrom's purpose

and to use the device for a purpose and in a configuration never envisioned by van Oostrom.

## IV.    The Board Adopted Unreasonably Broad Claim Constructions that Directly Affected the Board's Obviousness Determination.

In addition to rendering the primary reference inoperable and using impermissible hindsight, the Board adopted several erroneous claim constructions that resulted in harmful error.  The Board's failure to make a *prima facie* obviousness case is premised on unreasonably broad claim constructions. Therefore, the error is harmful.  *See In re Chapman*, 595 F.3d at 1338.

### A.    The Board erred by defining "server" so broadly as to include van Oostrom's data unit.

The Board majority's broad definition of server supplied its alleged justification to move the data acquisition unit across the network and to repurpose the data acquisition unit as a server to meet Appellant's claims.  The purpose of a server is to provide services (such as access to files or shared peripherals or the routing of e-mail) to other computers in the network.  Van Oostrom's data acquisition unit is a controller that collects medical device data from a plurality of medical devices using different communication protocols and converts that data into a standardized format for more efficient transmission to a central office.  To refer to the data acquisition unit as a server and a database is overbroad and

erroneous.  Similarly, to define "server" so broadly as to read on van Oostrom's data acquisition unit also is erroneous.

**B.     The Board erred by ignoring that a "network access point" has a protocol conversion requirement.**

The Board's obviousness rejection relies on an erroneous and overbroad construction of the claim term "network access point" to mean "access to a network."  Under a reasonable construction, requiring protocol conversion, the obviousness rejection would fail.

While the Board disagreed with Appellant's proposed construction of "network access point" as requiring conversion of medical device data to a network protocol (A10-12; A437), the Board adopted a self-serving definition devoid of any meaningful limitations.  The Board's construction of "network access point" required mere access to a network.  Furthermore, the Board's definition ignored the technical requirements of a network access point—namely conversion of data to a network protocol.  Absent protocol conversion, there can be no network access because access requires more than a physical connection.  The physical connection is only part of the requirement required.  Without the proper protocol there is no communication.

Moreover, the Board's unreasonably broad interpretation of "network access point" contravenes not only Appellants' specification, but also the references the Board relied upon as teaching network access points.  Both Kerr and Ortiz disclose

that network access points convert data to a network protocol. Specifically, Kerr teaches:

> The communication system *formats the data* received from the integration system *for transmission over a network* to the remote system. In a preferred embodiment, the data are sent over the Internet to the remote system. *The data can be formatted in any of a variety of appropriate formats known in the art.* If sent over the Internet, the *data may be put into any of the established Internet communications protocols.* For example, a text string containing the data could be inserted into the subject line or body of an Internet email, which would then be sent to a desired email address. Alternatively, the data could be put into a markup language such as HTML or XML, be inserted into a file sent over the network, or sent via a secure protocol such as SHTTP or SSL.

(A637 at 4:30-44 (emphasis added).) Kerr's communication system is relied upon by the Board as being equivalent to Appellants' first network access point. (A9.) Similarly, Ortiz teaches a variety of wireless network *protocols*, all of which inherently require data conversion before transmission over a network, including similar protocol conversions taught in Appellants' specification (*e.g.*, TCP/IP). (A670 at ¶¶ 109-110.)

The Board's erroneous construction of "network access point" is central to the obviousness rejection because, having removed any meaningful technical requirements, the Board then argued in circular fashion:

> Therefore, contrary to Appellants' arguments, the modification of van Oostrom in view of Kerr and Ortiz to include a network and corresponding network access points in place of van Oostrom's communication between the medical devices and data acquisition and

control unit does not require data protocol conversion but requires a
first and second point at which a network can be accessed.

(A11.)  The Board further argued that:

> Since van Oostrom describes utilizing network interface hardware
> protocol, for this additional reason the modification of van Oostrom in
> view of Kerr and Ortiz to include a network and corresponding
> network access points in place of van Oostrom's communication
> between the medical devices and data acquisition would not require
> any conversion of serial data from the medical device into a network
> protocol.

(A12.)  In other words, according to the Board majority, because a network access

point supposedly does not require protocol conversion, any connection (*e.g.*, van

Oostrom's serial lines) could be a network access point.  If that were true,

however, there would be no need for van Oostrom's data acquisition unit because

all medical devices would be able to access a network.

## CONCLUSION

The Board's determination affirming the rejection of Claims 17-40 as

obvious (and accordingly the remaining dependent claims) is unsupported by the

evidence of record.  Accordingly, the Board's decision must be reversed.

Respectfully submitted,

July 3, 2012                                    /s/ John J. Cotter
                                               John J. Cotter
                                               john.cotter@klgates.com
                                               Thomas A. Turano
                                               thomas.turano@klgates.com

                                               **K&L Gates LLP**
                                               One Lincoln Street
                                               Boston, MA  02111
                                               (617)-261-3100

                                               *Attorneys for Appellants*

# ADDENDUM



## UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 10/984,186 | 11/08/2004 | James W. Biondi | CPC-007C1 | 1673 |

22832        7590        12/30/2011
K&L Gates LLP
STATE STREET FINANCIAL CENTER
One Lincoln Street
BOSTON, MA 02111-2950

| EXAMINER |
|---|
| SURVILLO, OLEG |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2442 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 12/30/2011 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

BostonPatents@klgates.com
kay.spiridigliozzi@klgates.com

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE BOARD OF PATENT APPEALS
AND INTERFERENCES
_____

*Ex parte* JAMES W. BIONDI and AARON FAND
_____

Appeal 2010-003696
Application 10/984,186
Technology Center 2400
_____

Before MAHSHID D. SAADAT, KRISTEN L. DROESCH, and
GREGORY J. GONSALVES, *Administrative Patent Judges*.

Opinion for the Board filed by *Administrative Patent Judge* KRISTEN L.
DROESCH.

Opinion Dissenting filed by *Administrative Patent Judge* GREGORY J.
GONSALVES.

DROESCH, *Administrative Patent Judge*.

DECISION ON APPEAL

Appeal 2010-003696
Application 10/984,186

## STATEMENT OF THE CASE

Appellants seek review under 35 U.S.C. § 134(a) of a final rejection of claims 17-40[1]. We have jurisdiction under 35 U.S.C. § 6(b). We AFFIRM. An oral hearing was held on September 22, 2011.

## BACKGROUND

Appellants' invention relates to network monitoring systems that collect data from heterogeneous medical devices. Spec. 1-2; Abs.

Independent claim 17 is illustrative and reproduced below:

17.  A medical device monitoring system comprising:
    a plurality of medical devices, wherein at least two of said medical devices are heterogeneous types, said medical devices having data;
    a first network access point in communication with one of said plurality of medical devices, said first network access point passing requests to and receiving data from said one of said plurality of medical devices;
    a network in communication with said first network access point;
    a second network access point in communication with said network;
    a server in communication with said second network access point, said server comprising:
        a dedicated medical device application program for each type of said heterogeneous medical devices;
        a listener/pollster; and
    a database in communication with said server, said database comprising data from said plurality of medical devices;
        wherein said listener/pollster transmits requests to and receives data from said plurality of medical devices through said second data access point and passes requests to and data from said dedicated medical device application program, and

---

[1] Claims 1-16 and 41-43 have been cancelled.

3

Appeal 2010-003696
Application 10/984,186

wherein said dedicated medical device application
program passes data to and receives data from said database.

Claims 17-25 and 28-40 stand rejected under 35 U.S.C. § 103(a) as
unpatentable over van Oostrom (U.S. 6,074,345), Kerr (U.S. 6,942,616 B2)
and Ortiz (U.S. 2008/0065768 A1).

Claims 26-27 stand rejected under 35 U.S.C. § 103(a) as unpatentable
over van Oostrom, Kerr, Ortiz and Zimowski (U.S. 6,339,771 B1).

## ISSUES

Did the Examiner err in determining that the claimed invention would
have been obvious because the proposed modification would have changed
the principle mode of operation and rendered van Oostrom unsatisfactory for
its intended purpose and was based on improper hindsight?

Did the Examiner err in finding that the applied prior art describes: (1)
a server; (2) the server comprising a dedicated medical device application
program for each type of medical device; and (3) the server comprising a
listener pollster?

## FINDINGS OF FACT

### van Oostrom

1.  van Oostrom describes, referring to Figure 1 below, medical monitors 50
and therapeutic devices 60 connected to a data acquisition and control unit
10 which is designed to communicate with each of the devices and their
unique hardware communication protocol, software communication protocol
and data requirements. Col. 4, ll. 58-65.

4

Appeal 2010-003696
Application 10/984,186

2. van Oostrom's Figure 1 is reproduced below:



Figure 1 depicts monitors and therapeutic control devices
connected to a data acquisition and control unit.

3. Communicating with devices generally requires both hardware protocols
(input/output ports, serial interface RS-232, RS-422, parallel interface, DIN,
SCSI, network interface, etc.) and software/data protocols (output stream
format for display or printer, character printer format, line printer format,
packetized format, etc.). Col. 5, ll. 29-34.

4. The data acquisition and control unit 10 includes a microprocessor,
semiconductor memory, a solid state disk drive for mass storage and if
external communications is desired a modem or a similar external
communication device may be provided (telephone, microwave relay,
satellite link, cable, network and the like). Col. 7, ll. 36-65.

5. The data acquisition and control unit may be directly or remotely
connected to a central office or care center for reporting, storing, and
controlling the attached devices. Col. 7, l. 66 to col. 8, l. 1.

5

6.  The data may be transmitted (via modem, satellite, radio wave, wiring, infra-red, or other communication means) to a central station or other location as desired.  Col. 8, ll. 8-16.

7.  Data acquisition and control unit 10 includes a data management system (DMS) which is responsible for storing and retrieving measured data which is passed to other systems (e.g., central station, central office) in a network via the External Communication System which can communicate over network adapters.  Col. 8, ll. 1-4, 8-13, 20-25; col. 10, ll. 57-65; col. 11, ll. 32-39.

8.  van Oostrom describes defining Device Specific Operation Modules (DevSOMs) containing methods specific to a monitor or therapeutic device.  Col. 8, l. 67 to col. 9, l. 4; col. 11, ll. 55-58; col. 12, ll. 29-31; col. 12, l. 66-col. 13, l. 2.

9.  The DevSOMs include a devSOMPoll function that requests specific data from the medical device (e.g., infused volume, drug type requested from an infusion device) and a devSOMSetData function which sets a medical device parameter (e.g., infusion rate).  Col. 10, ll. 14-22; col. 13, ll. 26-35; Figs. 6d, 6e.

10. The DevSOM also includes DevSomGetData and DevSomPoll functions which send requests for data and retrieves data from the monitors or therapeutic devices.  Col. 10, ll. 14-23, col. 12, ll. 18-24; 56-58; col. 13, ll. 26-31; Figs. 6b, 6e.

<u>Kerr</u>

11.  Kerr describes, referring to Figure 1 below, a system for collecting and transmitting medical and health related data over a network including measuring devices, an integration system coupled to the measuring device, a

6

Appeal 2010-003696
Application 10/984,186

communications system, and a remote system. Col. 1, l. 49-58; col. 2, ll. 8-18.

12. Kerr's Figure 1 is reproduced below:



Figure 1 depicts a block diagram of the system for collecting and transmitting health data.

13. The integration system acquires data from the measuring devices and formats the data for transmission to the communications system to which it is communicatively coupled. Col. 3, ll. 47-49; col. 4, ll. 15-24.

14. The integration and communications systems can be a single unit using shared hardware and software and can also be integral with the measuring device. Col. 4, ll. 25-29.

15. The communication system can be communicatively coupled to the network using a variety of methods well known in the art. Col. 4, l. 59 to col. 5, l. 16.

16. The remote system is adapted to receive and decode the data transmitted from the communications system over the network, insert the data into one or more databases and provide a portal for accessing the data through a web browser via any computer over the Internet. Col. 1, ll. 61-67; col. 5, ll. 34-36, 47-56.

## ANALYSIS

We have reviewed the Examiner's rejection in light of Appellants' arguments in the Appeal Brief presented in response to the Final Office Action ("FOA") and the arguments in the Reply Brief presented in response to the Examiner's Answer. Only those arguments actually made by Appellants in the Appeal Brief and Reply Brief have been considered in this decision. Arguments not made in the Briefs have not been considered and are deemed to be waived. *See* 37 C.F.R. §§ 41.37(c)(1)(vii), 41.47(e).

The Examiner finds that van Oostrom describes a plurality of heterogeneous medical devices 50, 60 and a data acquisition and control unit 10 that corresponds to the claimed server. Ans. 4 (citing van Oostrom col. 1, ll. 20-25, 42-43, 48-56; Fig. 1). van Oostrom also describes that the data acquisition and control unit 10 includes a Data Management System which stores and retrieves measured data which is passed to other systems (e.g., central station, central office) in a network via the External Communication System. FFs 5-7. However, the Examiner finds that van Oostrom does not describe a first network access point in communication with the plurality of medical devices, a network in communication with said first network access point, and a second network access point in communication with the network, and the data acquisition and control device in communication with the second network access point. Ans. 5.

8

The Examiner finds that Kerr describes a plurality of heterogeneous medical devices and an integration and communications system (i.e., first network access point) in communication with the plurality of medical devices which passes request to and receives data from at least one of the medical devices and a network in communication with the communications system (i.e., a first network access point). Ans. 5 (citing Kerr col. 1, ll. 53-57; col. 2, l. 47 to col. 3, l. 2; col. 4, ll. 25-27, 33-38, col. 4, l. 59 to col. 5, l. 15; Fig. 3); *see also* Fig. 1. Kerr further describes a remote system in communication with the network which provides services, particularly access to medical device data in a database, to other computers over the Internet via a web portal. FF16.

The Examiner determined that it would have been obvious to one with ordinary skill in the art at the time the invention was made to modify van Oostrom's system to include a first network access point in communication with the plurality of medical devices which passes requests to and receives data from at least one of the medical devices, a network in communication with the first network access point, and where the data acquisition and control unit (i.e., a server) would be in communication with the network. The Examiner reasoned that such modification would replace van Oostrom's wire connections between the data acquisition and control unit and medical devices with transmission of medical and health related data to a server over a network as taught by Kerr. Ans. 6 (citing Kerr col. 1, ll. 49-50).

The Examiner also finds that Kerr does not explicitly show a second network access point in communication with the network and where the server (i.e., Kerr's remote system) in communication with the second network access point. Ans. 6. The Examiner finds that it is notoriously old

9

and well known in the art to utilize a network access point in order to communicatively couple a server to a network and directs attention to Ortiz in support of this finding. Ans. 6-7 (citing Ortiz Fig. 8; ¶¶ 98-100).

The Examiner further determined that it would have been obvious to one with ordinary skill in the art at the time the invention was made to modify the system of van Oostrom's as modified by Kerr to include a second network access point in communication with the network, and where the data acquisition and control unit (i.e., server) is in communication with the second network access point in order to enable the data acquisition and control unit (i.e., server) to access a network. Ans. 7.

Appellants argue that replacing van Oostrom's serial lines with networks or network connections as taught by Kerr necessitates a conversion step which renders van Oostrom unsatisfactory for its intended purpose and changes the principle mode of operation which Appellants characterize as collecting data over serial lines and sending data over a communication network through a modem. App. Br. 12, 14, 16; Reply Br. 4. Appellants' arguments rely on a specific meaning for the claim term "network access point" arguing it requires conversion of serial data from the medical device into a network protocol in accordance with how it is defined in Appellants' Specification. Reply Br. 4 (citing Spec. ¶ 24); *see also* App. Br. 14 (citing Spec. 4, ll. 16-21).

We do not agree with Appellants that the Specification includes sufficient support for the asserted narrow meaning for a network access point. During prosecution, the broadest reasonable meaning is applied to claim terms according to their ordinary usage as they would be understood by those with ordinary skill in the art while taking into account definitions

found in the written description. *In re Morris*, 127 F.3d 1048, 1054 (Fed. Cir. 1997). While Appellants direct us to paragraph 24 of their Specification for guidance on interpreting "network access point" (Reply Br. 4), Appellants' Specification does not provide an explicit definition for the term. *See generally* Specification. Although claims terms are to be given the broadest reasonable interpretation in light of the Specification, "limitations are not to be read into the claims from the specification." *In re van Geuns,* 988 F.2d 1181, 1184 (Fed. Cir. 1993) (citation omitted). Appellants do not persuasively argue nor direct us to objective evidence to demonstrate that a "network access point" has a particular ordinary meaning as understood by those with ordinary skill in the art. Rather, according to *Microsoft Computer Dictionary 5th ed.*, one with one with ordinary skill in the art would understand that a network access point ordinarily means one of the interchange points for internet traffic where various internet network carriers and major internet service providers exchange data. Rather than constrain Appellants to the ordinary meaning which is unsupported by the Specification, we find that the broadest reasonable meaning for a "network access point" consistent with the Specification includes a point at which a network can be accessed and does not necessarily require a specific data protocol conversion. Therefore, contrary to Appellants' arguments, the modification of van Oostrom in view of Kerr and Ortiz to include a network and corresponding network access points in place of van Oostrom's communication between the medical devices and data acquisition and control unit does not require data protocol conversion but requires a first and second point at which a network can be accessed.

Appeal 2010-003696
Application 10/984,186

Appellants' arguments are also unpersuasive because the teachings of van Oostrom are not limited to collecting data over serial lines and sending data over a communication network through a modem. Rather than limiting its description to serial lines (i.e., RS-232), van Oostrom contemplates communication between the medical devices and the data acquisition and control unit using a variety of hardware protocols including a parallel interface and network interface hardware protocols and thereby contemplates the use of parallel interfaces and network interfaces in addition to serial lines (e.g., RS-232). *See* col. 5, ll. 29-34. van Oostrom is also not limited to sending data over a modem. Instead, van Oostrom describes that the data acquisition and control unit may transmit data to a central station, central office or other desired location via a satellite link, network, radio waves, wiring, infra-red, or other communication means. FFs 4-6. Therefore, in addition to teaching a data acquisition and control unit that sends data over a network to another computer system (e.g., central office, central station), van Oostrom suggests that the medical devices can communicate with the data acquisition and control unit over a network utilizing network interface hardware and network interface hardware protocol. Since van Oostrom describes utilizing network interface hardware protocol, for this additional reason the modification of van Oostrom in view of Kerr and Ortiz to include a network and corresponding network access points in place of van Oostrom's communication between the medical devices and data acquisition would not require any conversion of serial data from the medical device into a network protocol.

Appellants also argue that the Examiner utilizes Appellants' invention in hindsight to create a roadmap for combining the references, as no other

basis exists for combining the references. Reply Br. 4-5. Appellants specifically argue that there is no rationale given why one would consider taking the serial lines of van Oostrom's data acquisition and control unit having direct connections to medical devices and replace them with an actual network requiring protocol conversion. Reply Br. 4-5. Appellants' arguments are unpersuasive because, as explained above, the claims do not require protocol conversion. We also recognize that any judgment on obviousness is in a sense necessarily a reconstruction based upon hindsight reasoning, but is proper so long as it takes into account only knowledge which was within the level of ordinary skill at the time the claimed invention was made and does not include knowledge gleaned only from applicant's disclosure. *In re McLaughlin*, 443 F.2d 1392, 1395 (CCPA 1971). Appellants do not persuasively explain how the determination of obviousness is based upon knowledge gleaned from Appellants' Specification. Rather, the combination of van Oostrom, Kerr and Ortiz is merely the substitution of one element (i.e., communication using a network and associated network access points) for another (the communication between van Oostrom's medical devices and data acquisition and control unit) known in the field. *See KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 416 (2007) (citing *United States v. Adams*, 383 U.S. 39, 50-51 (1966)). "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *Id.* Appellants do not direct us to objective evidence to demonstrate that substituting the communication between van Oostrom medical devices and data acquisition and control unit with Kerr and Ortiz' communication using

Appeal 2010-003696
Application 10/984,186

a network and associated network access points would yield an
unpredictable result.

Appellants also argue that van Oostrom does not describe a server, but
merely a control unit. App. Br. 10-11, 14. Appellants define a server as a
computer in a network that is used to provide services (such as access to
files or shared peripherals or the routing of e-mail) to other computers in the
network. App. Br. 10-11 (citing *Merriam-Webster's Collegiate ®
Dictionary, Eleventh Edition)*. Based on this limited interpretation,
Appellants characterize van Oostrom's data acquisition and control unit as a
node on a device side of a network, positioned between the medical devices
and the network with a central station positioned on the other side of the
network to receive the data sent by the medical devices. App. Br. 10-11, 14;
Reply Br. 5.

We do not agree with Appellants' characterization of van Oostrom's
data acquisition and control unit as merely a network node and not a server.
Consistent with the Examiner's findings (Ans. 13-14 (citing van Oostrom
col. 7, ll. 18-35)), van Oostrom's data acquisition and control unit provides
services to other computers in a network since it includes a data
management system (DMS) which is responsible for storing and retrieving
measured data which is passed to other systems (e.g., central station, central
office) in a network via the External Communication System communicating
over network adapters. FF 7.

Appellants further argue that van Oostrom does not describe a
dedicated medical device application program for each type of
heterogeneous medical device. App. Br. 12-14. The Examiner finds that
van Oostrom's Device Specific Operation Module (DevSOM) operating on

14

Appeal 2010-003696
Application 10/984,186

the data acquisition and control unit [10] corresponds to the "server comprising a dedicated medical device application program for each type of said heterogeneous medical devices" recited in claim 17. Ans. 4 (citing van Oostrom col. 6, ll. 38-38; col. 7, ll. 13-15; col. 8, l. 67-col. 9, l. 7; col. 9, ll. 55-58). In response, Appellants argue that van Oostrom's DevSOMs are simply protocol setting programs that permit the control unit to communicate with the medical device. App. Br. 12-14.

We disagree with Appellants' characterization of van Oostrom's DevSOMs as protocol setting programs because contrary to Appellants' arguments, van Oostrom's DevSOMs are not so limited. Instead, consistent with the Examiner's findings (Ans. 4), van Oostrom describes defining a DevSOM for each device that contains methods specific to a monitor or therapeutic device (i.e., medical device). FF 8. More specifically, van Oostrom describes that the DeVSOMs include a devSOMPoll function that requests specific data from the medical device (e.g., infused volume, drug type requested from an infusion device) and a devSOMSetData function which sets a medical device parameter (e.g., infusion rate). FF 9. Accordingly, van Oostrom's DevSOMs contain methods specific to a medical device including functions that request specific data from the medical device and set medical device parameters and therefore van Oostrom describes the claimed dedicated medical device application program.

Appellants further argue that van Oostrom does not describe a listener/pollster. App. Br. 15. The Examiner finds that van Oostrom's DevSomGetData and DevSomPoll functions of the DevSOM correspond to a "server comprising . . . a listener pollster" recited in claim 17. Ans. 4

15

(citing van Oostrom, col. 10, ll. 18-27). The Examiner further finds that van Oostrom's listener pollster transmits requests to and receives data from the plurality of medical devices and passes requests to and data from the dedicated medical device application program. Ans. 4 (citing van Oostrom col. 12, ll. 18-24, col. 12, ll. 56-61). Appellants argue that the Examiner defines portions of the same program (i.e., van Oostrom's DevSOMs) to correspond to two different programs of the invention. App. Br. 15. Appellants further argue that based on the claim limitations, it is clear that the listener pollster passes data to and from the medical device and to and from the application program and the application program takes the data from the listener pollster and passes it to the database. Reply Br. 4.

Appellants' arguments are not commensurate in scope with the claim limitations. Claim 17 recites a "server comprising a dedicated medical device application program for each type of said heterogeneous medical devices; a listener/pollster; . . . said listener pollster . . . passes requests to and data from said dedicated medical device application program." Claim 17 does not require the dedicated medical device application program to be separate or mutually exclusive of the listener pollster. Nor does claim 17 preclude some overlap between the functions provided by the dedicated medical device application program and the listener/pollster. Consistent with the Examiner's findings, van Oostrom's DevSomGetData and DevSomPoll functions are implemented in the DevSOM which send requests for data and retrieve data from the monitors or therapeutic devices meet the claimed listener/pollster. FF 10.

Appellants also present arguments for the first time in the Reply Brief directed to the database claim limitation. Reply Br. 2-3. Appellants'

Appeal 2010-003696
Application 10/984,186

arguments addressing the database are not presented in Response to the Examiner's Answer and could have been raised in the Appeal Brief. *Compare* Ans. 4 *with* FOA 5, 7. Since the arguments in the Reply Brief directed to the database could have been presented in the Appeal Brief to rebut the rejections made in the Final Office Action, Appellants' arguments are waived and are not considered. *Ex parte Borden*, 93 USPQ2d 1473, 1474 (BPAI 2010) (informative decision) ("[T]he reply brief [is not] an opportunity to make arguments that could have been made in the principal brief on appeal to rebut the Examiner's rejections, but were not.").

Similarly, Appellants raise for the first time in the Reply Brief arguments rebutting the Examiner's finding that van Oostrom's data acquisition and control unit is connected to the medical devices by a wired network comprising connections by wires. Reply Br. 3. These arguments could have also been raised in the Appeal Brief responsive to the Final Office Action. *Compare* Ans. 4 *with* FOA 2-4, 8. Accordingly, Appellants' arguments directed to the Examiner's finding in the Final Office Action that van Oostrom describes a wired network are waived and are not considered.

For all these reasons, we sustain the rejection of claims 17-25 and 28 and 40 as obvious over van Oostrom, Kerr and Ortiz. Since Appellants do not present separate arguments substantively addressing the limitations of claims 26 and 27, we sustain the rejection of claims 26 and 27 as obvious over van Oostrom, Kerr, Ortiz and Zimowski for the same reasons.

## DECISION

We AFFIRM the rejection of claims 17-25 and 28-40 under 35 U.S.C. § 103(a) as unpatentable over van Oostrom, Kerr and Ortiz.

Appeal 2010-003696
Application 10/984,186

We AFFIRM the rejection of claims 26-27 under 35 U.S.C. § 103(a) as unpatentable over van Oostrom, Kerr, Ortiz and Zimowski.

## TIME PERIOD

No time period for taking any subsequent action in connection with this appeal may be extended under 37 C.F.R. § 1.136(a)(1)(iv).

## AFFIRMED

msc

Appeal 2010-003696
Application 10/984,186

Dissenting Opinion

Gonsalves, *Administrative Patent Judge*

I respectfully dissent from the majority in affirming the Examiner's

obviousness rejection of claims 17-38 because — for the reasons expressed

by Appellants — one of ordinary skill in the art would not have modified the

system of the primary reference, van Oostrom, in the manner described by

the Examiner and the majority.  As explained by Appellants, each of the

independent claims on appeal requires a medical device to communicate

with a network by a first network access point and a server to communicate

with the network by a second network access point.  (*See* App. Br. 4-6.)  In

other words, in the claimed invention, the server "and the second network

access point are on one side of the network and the medical devices and the

first network access point are on the other."  (App. Br. 11.)  The device

selected by the Examiner as the claimed server, van Oostrom's Data

Acquisition & Control Unit 10, "is designed to recognize, understand, and

communicate with each of these [medical] devices and their unique

hardware communication protocol, software communication protocol, and

data requirements (input and/or output)."  (van Oostrom, 4:61-65.)  As

explained by Appellants, moving this control unit to the opposite side of the

network as the medical devices by replacing the direct connections between

19

the medical devices and the control unit with connections to a network, as

proposed by the Examiner, vitiates van Oostrom's purpose, which "is to

collect data over the serial lines and send that data over a communication

network through a modem." (App. Br. 12.) In other words, the Examiner's

proposed modification would render van Oostrom's control unit superfluous.

There would be no need for the control unit to collect data and transmit it

through a network if the data had already been sent through the network

before it reached the control unit. Moreover, if the control unit were moved

to the opposite side of the network as the medical devices, additional means

would be needed to get data from the serial lines of the medical devices to

the network. (*Id.*) Appellants clearly summarized their arguments in

response to questions that were asked at the hearing:

> MR. TURANO: That's correct. But the issue here is
> Kerr, just on network access points, it allows for
> communication between two points. We're not claiming that.
> What is important, though, is what is the purpose of van
> Oostrom? Van Oostrom's purpose is to get data from devices
> and put it on a network, right? So you can't -- I don't think you
> can -- my position is you can't say, well, I'm going to replace
> these connections with a network, because that's the problem
> that's trying to be solved.
> How does the -- if I replace this with a network, how
> does the data get from here to the network? Well, you need
> another one of these because none of these devices talk
> network.

     JUDGE GONSALVES:  Okay.  I think I understand your point.  Your point is that a big part of van Oostrom is that control of that -- drew there.

     MR. TURANO:  Yes.

     JUDGE GONSALVES:  And that if you take the network, what's taught about network access points in Kerr and you move it between the devices and the controller, then --

     MR. TURANO:  You're back at the same place again.

     JUDGE GONSALVES:  Yeah.  Then, basically, you don't really need the controller for anything.

     MR. TURANO:  Right.

     JUDGE GONSALVES:  Correct?

     MR. TURANO:  Correct.

     JUDGE GONSALVES:  And then also, the second thing is that you have to do something between the medical devices and the network that you've -- the network access point that you've shoehorned in there between the devices and the controller of -- so the controller becomes superfluous if you do that.

     MR. TURANO:  Correct.
communicate on the opposite side of the network as the medical devices.

     JUDGE GONSALVES:  And then in addition, there's something missing because you have to have some protocol conversion at the network access.

     MR. TURANO:  You still have to get from here to here.

(Record of Oral Hearing held September 22, 2011, 8:14-9:18.)

Accordingly, the modification of van Oostrom's system proposed by

the Examiner and accepted by the majority is irrational; the

Examiner's reasoning clearly does not rise to the level of a required

"rational underpinning to support the legal conclusion of

Appeal 2010-003696
Application 10/984,186

obviousness.'" *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398, 418

(2007) (citation omitted).

For these reasons, I dissent from the majority's affirmance of

the Examiner's rejections of each of the independent claims, as well

as the claims that depend from them.

22

Appeal 2010-003696
Application 10/984,186

EVIDENCE APPENDIX

*Microsoft Computer Dictionary* 5th *ed.*, 362 (2002).

23

| Notice of References Cited | Application/Control No. 10/984,186 | Applicant(s)/Patent Under Reexamination Appeal No. 2010-003696 | |
|---|---|---|---|
| | Examiner | Art Unit | Page 1 of 1 |

**U.S. PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Name | Classification |
|---|---|---|---|---|---|
| | A | US- | | | |
| | B | US- | | | |
| | C | US- | | | |
| | D | US- | | | |
| | E | US- | | | |
| | F | US- | | | |
| | G | US- | | | |
| | H | US- | | | |
| | I | US- | | | |
| | J | US- | | | |
| | K | US- | | | |
| | L | US- | | | |
| | M | US- | | | |

**FOREIGN PATENT DOCUMENTS**

| * | | Document Number Country Code-Number-Kind Code | Date MM-YYYY | Country | Name | Classification |
|---|---|---|---|---|---|---|
| | N | | | | | |
| | O | | | | | |
| | P | | | | | |
| | Q | | | | | |
| | R | | | | | |
| | S | | | | | |
| | T | | | | | |

**NON-PATENT DOCUMENTS**

| * | | Include as applicable: Author, Title Date, Publisher, Edition or Volume, Pertinent Pages) |
|---|---|---|
| | U | *Microsoft Computer Dictionary 5th ed.* |
| | V | |
| | W | |
| | X | |

*A copy of this reference is not being furnished with this Office action. (See MPEP § 707.05(a).)
Dates in MM-YYYY format are publication dates. Classifications may be US or foreign.

U.S. Patent and Trademark Office
PTO-892 (Rev. 01-2001)                    Notice of References Cited                    Part of Paper No.

A24

**Netscape Navigator** *n.* The widely used family of Web browser programs, made by Netscape Corporation. Versions of Netscape Navigator are available for the Windows and Macintosh platforms, and for many varieties of UNIX. Netscape Navigator, which is based on NCSA's Mosaic Web browser, was one of the first commercially available Web browsers. In 1999, Netscape Corporation was purchased by America Online. *See also* Mosaic, Web browser.

**Netscape Netcaster** *n.* *See* netcasting (definition 2).

**Netscape Server Application Programming Interface** *n.* *See* NSAPI.

**Netspeak** *n.* The set of conventions for writing English in e-mail, IRCs, and newsgroups. Netspeak is characterized by acronyms (such as IMHO or ROFL) and clarifying devices such as emotags and emoticons. Use of Netspeak should be governed by netiquette. *See also* emotag, emoticon, IMHO, IRC, netiquette, ROFL.

**netspionage** *n.* Corporate-sponsored hacking of a competitor's digital information for the theft of trade secrets.

**Net surfing** *n.* The practice of exploring the Internet without a specific goal in mind. The concept of Net surfing is similar to (and probably derived from) "channel surfing" in reference to watching television.

**Net TV** *n.* *See* Internet television.

**NetWare** *n.* A family of LAN (local area network) operating system products developed by Novell, Inc. Designed to run on PCs and Macintoshes, Novell NetWare allows users to share files and system resources such as hard disks and printers. *See also* network operating system.

**network** *n.* A group of computers and associated devices that are connected by communications facilities. A network can involve permanent connections, such as cables, or temporary connections made through telephone or other communication links. A network can be as small as a LAN (local area network) consisting of a few computers, printers, and other devices, or it can consist of many small and large computers distributed over a vast geographic area (WAN, or wide area network). *See also* ALOHAnet, Ethernet (definition 1), LAN, WAN.

**Network Access Point** *n.* One of the interchange points for Internet traffic, where various Internet network carriers and major ISPs exchange data. When Internet traffic originates on one network and goes to another network, it almost always passes through at least one Network Access Point, or NAP. In the United States, major NAPs include MAE East, in Vienna, Virginia, and MAE West, in San Jose, California (both operated by MCI WorldCom), the Chicago NAP (operated by Ameritech); the Pacific Bell NAP (with multiple locations in California); the Digital Internet Exchange in Palo Alto, California (operated by Digital/Compaq); and the Sprint NAP in Pennsauken, New Jersey. Additional local and regional exchange points are located in many other locations around the world. *Acronym:* NAP. *Also called:* National Attachment Point.

**network adapter** *n.* *See* network interface card.

**Network Address Translation** *n.* *See* NAT.

**network administrator** *n.* The person in charge of operations on a computer network. The duties of a network administrator can be broad and might include such tasks as installing new workstations and other devices, adding and removing individuals from the list of authorized users, archiving files, overseeing password protection and other security measures, monitoring usage of shared resources, and handling malfunctioning equipment. *See also* system administrator.

# CERTIFICATE OF SERVICE

Appeal No. 2012-1300
(Serial No. 10/984,186)


In Re James W. Biondi and Aaron Fand


I hereby certify that on July 3, 2012 I electronically filed the foregoing

OPENING BRIEF OF APPELLANTS using the court's CM/ECF filing system.

Counsel for the Appellee, attorneys for the Director, United States Patent and

Trademark Office, were electronically served via email per Fed. R. App. P. 25 and

Fed. Cir. R. 25(a) and 25(b).


/s/ John J. Cotter
John J. Cotter
*Attorney for Appellants*

**K&L Gates LLP**
One Lincoln Street
Boston, MA  02111
617.261.3100
john.cotter@klgates.com

## CERTIFICATE OF COMPLIANCE WITH
## FEDERAL RULE OF APPELLATE PROCEDURE 32(a)(7)(B) AND
## FEDERAL CIRCUIT RULE 32(b)

Appeal No. 2012-1300
(Serial No. 10/984,186)

In Re James W. Biondi and Aaron Fand

Counsel for Appellants hereby certifies that the pertinent portions of the foregoing OPENING BRIEF FOR APPELLANTS does not contain more than 14,000 words, specifically 6,961 words as determined by the word processing software used to prepare the brief, and thus this brief is in compliance with Federal Rule of Appellate Procedure 32(a)(7)(B) and Federal Circuit Rule 32(b).

July 3, 2012

/s/ John J. Cotter
John J. Cotter
*Attorney for Appellants*

**K&L Gates LLP**
One Lincoln Street
Boston, MA  02111
617.261.3100
john.cotter@klgates.com